IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER LYNN TOLLON, | ) | CASE NO. 1:21-CV-1507 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Jennifer Lynn Tollon ("Plaintiff" or "Tollon"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her application

for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Disabled Widow's Benefits

("DWB") under Titles II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In September 2018, Tollon filed applications for POD, DIB, and DWB alleging a disability onset

date of February 2, 2018 and claiming she was disabled due to: lesions on the brain due to traumatic brain

injury, cognitive effects in the non-verbal part of brain, racing thoughts, obsessive compulsive behavior,

can't organize my thoughts, brain doesn't shut off, sleep disturbances from brain injury, PTSD, anxiety

disorder, spinal stenosis, tension headaches, osteoarthritis, high cholesterol, feet problems/surgeries, and

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

difficulty walking due to feet problems.  Transcript ("Tr.") at 229, 244, 272.  The applications were denied initially and upon reconsideration, and Tollon requested a hearing before an administrative law judge ("ALJ").  Tr. 158.

On August 23, 2019 an ALJ held a hearing, during which Tollon, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 35-74.  On September 5, 2019, the ALJ issued a written decision finding that Tollon was not disabled.  Tr. 15-29.  The Appeals Council declined further review, Tollon filed a complaint in federal court, and the parties stipulated to a remand, which the District Court for the Northern District of Ohio entered on November 18, 2020.  Tr. 780-782.

Meanwhile, Tollon had filed a new application for benefits.  Tr. 648.  On remand, the ALJ consolidated Tollon's applications and held a hearing on April 28, 2021, during which Tollon, represented by counsel, and a VE testified.  Tr. 675-716.  On May 26, 2021, the ALJ issued a written decision finding that Tollon was not disabled.  Tr. 645-673.  On August 23, 2021, Tollon bypassed the Appeals Council and appealed to the Court to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 9, 12, 13.

Tollon asserts the following assignments of error:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul is constitutionally defective.

2. The ALJ erroneously failed to follow the remand order of this Court and properly evaluate the opinions of the treating rheumatologist.

3. The ALJ erred when her RFC failed to include all Tollon;s severe impairments and consider the effect of the combination of Tollon's severe impairments on her ability to engage in substantial gainful activity at the light level of exertion on a full-time and sustained basis.

4. The ALJ erred in that her evaluation of Tollon's symptoms was in violation of Social Security Ruling 16-3p.

Doc. No. 9, p. 1.

## II. EVIDENCE

**A.  Personal and Vocational Evidence**

Tollon was born in 1967 and was 50 years old on her alleged disability onset date.  Tr. 663.  She has prior work as a workshop supervisor/home health aide.  Tr. 663.

**B.  Relevant Medical Evidence[2]**

On January 9, 2018, Tollon saw Natwarlal Jethva, M.D., at her primary care physician's office for blood work.  Tr. 460.  She also reported numbness and pain in her right hand and bunion pain in her feet.  Tr. 460.  An x-ray of her right wrist compared to a December 2016 x-ray showed degenerative changes at the first carpometacarpal (CMC) joint and no other specific or significant degenerative abnormalities.  Tr. 473.

On February 5, 2018, Tollon had a bunionectomy performed on her right foot due to hallux valgus deformities.  Tr. 373.  On June 14, 2018, she had a bunionectomy performed on her left foot.  Tr. 423.

On March 15, 2018, Tollon saw neurologist Suresh Kumar, M.D., and reported that she had been in a motor vehicle accident in 1996 and had been in a coma for 4 days.  Tr. 642.  She complained of experiencing a lot of anxiety and stated that she was finding it more difficult to work due to memory problems.  Tr. 642.  Upon exam, she had normal speech, attention, concentration, and fund of knowledge, and "a lot of anxiety."  Tr. 642.  She could not perform sequence completion tasks and had difficulty copying a cube.  Tr. 642.  She had a normal gait and station and normal strength, muscle tone,

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.  The Initial Order states, "Any facts recited in support of the Argument section of the brief must also be set forth in the Facts section of the brief."  Doc. No. 3, p. 5.  Here, Tollon did not set forth all the facts relevant to her argument in the "Facts" section of her brief.  Rather, the argument section of her brief contains swaths of factual evidence that she did not detail in the "Facts" section.  *See, e.g.*, Doc. No 9 p. 31 (describing evidence in two function reports in the "Argument" section with no details in the "Facts" section of the brief); pp. 14-15, 17 (detailing items in both of Dr. Ignat's opinions in the "Argument" section without citing any findings from those opinions in the "Facts" section of the brief).  Counsel has been warned about this practice before.  *See, e.g.*, Case No. 4:21-cv-1038, Doc. No. 15, p. 3, n. 3 (filed 4/6/2022).  Counsel's failure to follow the Court's briefing order may result in a court striking portions of her brief that are non-compliant.

reflexes, sensation, and coordination.  Tr. 642-643.  Dr. Kumar recommended another brain MRI and a neuropsychological evaluation.  Tr. 643.  A brain MRI on March 23 showed a few scattered non-specific white matter hyperintensities unchanged from a 2009 MRI.  Tr. 419.

On March 28, 2018, Tollon had a neuropsychological assessment with Amir Poreh, Ph.D.  Tr. 403-406.  After abbreviated intelligence testing and a mental status examination, Dr. Poreh concluded that her intelligence fell within the low average range and she had a mild impairment in cognitive functioning.  Tr. 405-406.  She had difficulty encoding complex nonverbal information into memory, which required intact executive functioning.  Tr. 406.  Dr. Poreh wrote that her intelligence scores fell within the expected range for both verbal and nonverbal domains relative to her educational and occupational history.  Tr. 406.  He reviewed the brain MRI and commented that the results often cause executive function deficits due to poor activation of the prefrontal regions of the brain but observed that those deficits were not new and had remained relatively unchanged in the past decade.  Tr. 406.  He found that Tollon was exhibiting severe PTSD symptoms from the death of her husband and depression and recommended psychiatric care and therapy.  Tr. 406.  He commented that her subjective complaints of impaired memory were due to her past head injury and her current emotional state.  Tr. 406.  He diagnosed diffuse traumatic brain injury, PTSD, and mild, recurrent major depressive disorder.  Tr. 406.

On April 12, 2018, Tollon saw Dr. Jethva for a regular appointment.  Tr. 457.  She was assessed with intractable tension type headaches and primary osteoarthritis involving multiple joints and Dr. Jethva prescribed medication.  Tr. 457.  Upon exam, she had a normal mood and affect and normal range of motion and muscle strength and tone.  Tr. 459.

On July 13, 2018, Tollon saw Aman Ramella, M.D., at her primary care physician's office for a 3-month follow up.  Tr. 454.  She complained of anxiety and recent stressors.  Tr. 455.  She reported seeing a neurologist recently for tension headaches and denied headaches.  Tr. 455.  Upon exam, she had

4

a normal mood and affect, normal range of motion and muscle strength and tone, and intact reflexes, sensation, gait and coordination.  Tr. 455.  Dr. Ramella prescribed medication for anxiety.  Tr. 454.

On October 5, 2018, Tollon saw Dr. Ramella for a regular appointment.  Tr. 552.  She reported back pain and stated that her brain did not shut off, preventing her from sleeping more than 3 hours a night.  Tr. 552.  Upon exam, she had a normal mood and affect, normal range of motion and muscle strength and tone, and intact reflexes, sensation, gait and coordination.  Tr. 553.

On October 29, 2018, Tollon saw nurse practitioner Anthony Shumway for a psychiatric evaluation.  Tr. 506-514.  Shumway diagnosed generalized anxiety disorder, PTSD, insomnia, disappearance and death of family member, alcohol dependence in remission, and major depressive disorder.  Tr. 514.  In December she saw Shumway and had a moderately impaired memory, poor attention span, dysthymic mood, and high anxiety.  Tr. 528.  She had an appropriate mood, an open and cooperative attitude, clear speech, and good judgment.  Tr. 528.  Shumway adjusted her medications. Tr. 529.

On November 1, 2018, Tollon saw Gheorghe Ignat, M.D., upon referral from Dr. Ramella, for joint pain and muscle stiffness.  Tr. 518.  Upon exam, she had decreased cervical and lumbar spine range of motion, lumbar spine tenderness, tender (but not swollen) first CMC joints with decreased range of motion, normal range of motion in all remaining joints (shoulders, elbows, wrists, knees, ankles), some hip tenderness, no tenderness in her feet, intact upper and lower extremity strength, intact sensation, and negative straight leg raise testing.  Tr. 519.  Dr. Ignat assessed inflammatory arthritis and myofascial pain syndrome; stated that it was possible she had a chronic sensitization problem with features of fibromyalgia, not controlled; and ordered labwork and prescribed Cymbalta.  Tr. 518.  At a follow-up on November 21, Tollon complained of fatigue and headaches.  Tr. 537.  Dr. Ignat stopped her Cymbalta due to side effects and prescribed Lyrica.  Tr. 537.  Her exam findings were the same as her prior visit.

5

Tr. 528-529.

On January 4, 2019, Tollon saw Dr. Ignat for a 6-week follow-up.  Tr. 534.  She reported pain all over and severe stiffness.  Tr. 534.  She had stopped taking her medications due to a rash.  Tr. 534.  Dr. Ignat wrote that it was more likely that Tollon had seronegative rheumatoid arthritis rather than osteoarthritis.  Tr. 534.  He restarted her Lyrica, as it was unlikely to have caused a rash.  Tr. 534.

On January 15, 2019, Tollon saw Shumway and reported stopping her psychotropic medication since the previous visit "for reasons unclear."  Tr. 598.

On February 21, 2019, Tollon returned to Dr. Ignat and reported mild joint pain.  Tr. 583.  Her exam findings were as before.  Tr. 584-585.

On March 26, 2019, Tollon saw Shumway.  Tr. 608.  He asked her to rate her mood and anxiety levels but she would not, despite repeated requests to do so.  Tr. 609.  Shumway recommended therapy, but Tollon was "disinterested" and made excuses for missing her previous therapy appointment.  Tr. 613.  Shumway adjusted her medications.  Tr. 613.

On April 23, 2019, Tollon saw Dr. Ignat and reported having stopped all of her medication because her head was foggy and she could not function.  Tr. 586.  Dr. Ignat gave her a Vitamin B12 injection.  Tr. 577.

On May 6, 2019, Tollon saw Shumway for a follow-up appointment.  Tr. 615.  She reported doing "ok," then revealed that she had stopped taking all her medications in mid-April, then revealed that she had remained on one of her medications.  Tr. 615.  Shumway commented that Tollon had stopped one of her medications after "only" 2 weeks and that she denied it caused side effects; he wrote, "strong adherence to the sick/helpless role."  Tr. 615.  He added, "very treatment resistant and noncompliant w/ therapy."  Tr. 619.  On May 28, her last visit with Shumway, she reported that Dr. Ignat had started Topamax for her headaches, which improved them and also helped her racing thoughts,

6

and "quieted things down."  Tr. 625, 629.  She was "ecstatic" about her response to Topamax and was not interested in any mood stabilizers or antidepressants.  Tr. 629.  Shumway adjusted her sleep medication and she was to follow up in 5-6 weeks.  Tr. 630.

On April 22, 2019, Tollon saw Dr. Ramella for a follow-up.  Tr. 580.  She reported that Dr. Ignat had diagnosed her with fibromyalgia.  Tr. 580.  She complained of depression and recently had stopped her medication; she would be seeing psychiatry again in 14 days.  Tr. 581.  Upon exam, she had a depressed mood, intact gait, coordination, sensation, and reflexes, and normal strength and range of motion.  Tr. 581.  Dr. Ramella assessed Vitamin D deficiency, depression, PTSD, and anxiety disorder.  Tr. 580.

On May 8, 2019, Tollon saw Dr. Ignat for a follow-up.  Tr. 638.  She reported joint pain all over.  Tr. 638.  She was not taking Topamax.  Tr. 638.  Her exam results remained the same: decreased cervical and lumbar spinal range of motion, lumbar spine tenderness, tender (but not swollen) first CMC joints with decreased range of motion, normal range of motion in all remaining joints (shoulders, elbows, wrists, knees, ankles), some hip tenderness, no tenderness in her feet, intact upper and lower extremity strength, intact sensation, and negative straight leg raise testing.  Tr. 639-640.

On May 21, 2019, Dr. Ignat completed a Medical Source Statement on Tollon's behalf.  Tr. 543-546.  He listed her symptoms of stiffness and joint pain in her shoulder and lumbar and cervical spine with decreased range of motion in her spine.  Tr. 543.  He opined that she could sit for 90 minutes at a time, for 6 hours total in an eight-hour workday and stand/walk for 20 minutes at a time, for 2 hours total in an eight-hour workday.  Tr. 544.  She would need to take unscheduled breaks three times per day for twenty minutes at a time due to muscle weakness, chronic fatigue, pain/numbness, and medication side effects.  Tr. 544.  She did not need an assistive device.  Tr. 545.  She could occasionally lift 10 pounds and rarely lift 20 pounds, she would be off-task 25% or more of the workday, and she could only

use her hands and arms for 20% of the workday or less to perform reaching and manipulative tasks.  Tr. 545.  She was incapable of even "low stress work" and would miss more than four days of work per month.  Tr. 546.

On June 5, 2019, Tollon saw Dr. Ignat for a follow-up.  Tr. 635.  She reported joint pain in her shoulders and neck, headaches, and mild joint pain in both hands.  Tr. 635.  Her exam findings were the same as her prior visit.  Tr. 636.  She restarted Topamax.  Tr. 635.

On June 12, 2019, Tollon saw Dr. Ramella for a follow-up.  Tr. 1118.  She reported anxiety, tremors, mood instability, and fatigue, and believed that Topamax, which she had restarted, was causing those symptoms.  Tr. 1119.  Upon exam, she had tremors, an intact gait, coordination, sensation, reflexes, and motor function, normal muscle strength and tone and range of motion, and a normal mood and affect.  Tr. 1119.

On August 7, 2019, Tollon saw Dr. Ignat for a follow-up and reported mild joint pain.  Tr. 1122.  Her exam findings were as her prior visit.  Tr. 1123-1124.

On September 20, 2019, Tollon saw Dr. Ramella for a follow-up.  Tr. 1125.  Her exam findings were normal.  Tr. 1126-1127.

On October 9, 2019, Tollon saw Dr. Ignat for a follow-up and reported low back pain for the past week.  Tr. 1128.  Her exam findings were the same as before except that she had a positive paraspinal lumbar trigger points and tenderness in her trochanteric bursa.  Tr. 1130.  Dr. Ignat gave her a Kenalog injection in her lumbar trigger points.  Tr. 1129.

On January 8, 2020, Tollon saw Dr. Ignat for a follow-up and reported generalized pain.  Tr. 1132.  Her exam findings were as her prior visit.  Tr. 1133-1134.

On April 8, 2020, Tollon saw Dr. Ignat for a follow-up and reported joint pain, worse in her elbows.  Tr. 1013.  She was no longer taking Topamax and Dr. Ignat restarted it.  Tr. 1013.  Her exam

8

was as her prior visit except that she also had fibromyalgia trigger points in her trapezius and gluteal region.  Tr. 1014-1015.  Dr. Ignat assessed trochanteric bursitis in both hips, myofascial pain syndrome, and inflammatory arthritis.  Tr. 1013.

On February 6, 2020, Tollon saw Dr. Ramella for a follow-up; the treatment note indicates that she endorsed headaches and that she denied headaches.  Tr. 1135-1136.

On May 11, 2020, Tollon saw Dr. Ramella for a follow-up and reported concerns about taking Topamax.  Tr. 1141.  She said that she had been reading about burning mouth syndrome and thought she might have it; she asked to reduce her Topamax.  Tr. 1141.  She reported feeling ok in general but felt general fatigue, which she attributed to her fibromyalgia.  Tr. 1141.  Her exam findings were normal.  Tr. 1142.

On July 29, 2020, Tollon followed up with Dr. Ignat and had Heberden nodes on her hands.  Tr. 1152, 1154.

On January 20, 2021, Dr. Ignat completed another Medical Source Statement on behalf of Tollon.  Tr. 1229-1232.  Dr. Ignat listed her symptoms: joint pain, stiffness and fatigue.  Tr. 1229.  He wrote that Tollon experienced chronic pain in her shoulder, cervical and lumbar spine, hips and hands and that she had decreased range of motion in her lumbar and cervical spine. Tr. 1229.  He opined that she could sit for 20 minutes at a time, for less than 2 hours total, stand/walk for 10 minutes at a time, for less than 2 hours total, and rarely lift up to 10 pounds.  Tr. 1230–1231.  He opined that she needed to take unscheduled breaks 4-5 times a day for 20-30 minutes at a time and elevate her legs to 30 degrees for 40% of the workday.  Tr. 1230-1231.  She needed a cane or other hand-held assistive device at all times for walking and standing due to imbalance, pain, and recent falls.  Tr. 1231.  She was limited to using her hands and arms to reach or perform manipulative tasks for 10% of the workday.  Tr. 1231.  She was incapable of even low-stress work, she would be off-task for 25% of the workday, and she

9

would miss more than 4 days of work per month.  Tr. 1231-1232.

On April 20, 2021, Tollon saw Dr. Ignat for a follow-up and reported pain in her mid-back and elbows.  Tr. 1235.  Upon exam, she had decreased cervical and lumbar spinal range of motion, lumbar spine tenderness and spasms, tender (but not swollen) first CMC joints with decreased range of motion and Heberden nodes, normal range of motion in all remaining joints (shoulders, elbows, wrists, knees, ankles), trochanteric hip tenderness, intact upper and lower extremity strength, intact sensation, negative straight leg raise testing, and fibromyalgia trigger points in her trapezius, lumbar paraspinals, gluteal, trochanter, and thoracic spine.  Tr. 1237.  Dr. Ignat assessed fibromyalgia, not controlled and with frequent flares; trochanteric bursitis; myofascial pain syndrome; inflammatory arthritis; coronary artery disease; low B12; and low back pain.  Tr. 1235.  He ordered thoracic and lumbar spine x-rays.  Tr. 1235. X-rays showed arthritic changes and facet arthritis, disc degeneration in the thoracic and lumbar spine, and lumbar anterolisthesis.  Tr. 1234.

On May 4, 2021, Tollon saw Dr. Ignat for a follow-up and reported pain in her hands, back and knees.  Tr. 1253.  Her exam findings were as her prior visit.  Tr. 639-640.  Dr. Ignat added a diagnosis of spondylolisthesis at L4-L5 and ordered a lumbar MRI.  Tr. 1253.

## C.    State Agency Reports

*First application*: On November 14, 2018, Lynne Torello, M.D., reviewed Tollon's record and found that she could lift 20 pounds occasionally and 10 pounds frequently; stand/walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally operate foot controls with the bilateral lower extremities; occasionally balance, stoop, crouch, crawl, kneel, and climb ramps and stairs, and could never climb ladders, ropes, or scaffolds.  Tr. 83–84.  On January 22, 2019, David Knierim, M.D., affirmed Dr. Torello's opinion.  Tr. 114-115.

On November 16, 2018, Courtney Zeune, Psy.D., reviewed Tollon's record and found that she had moderate limitations in her ability to understand, remember, or apply information and concentrate, persist, or maintain pace, and mild limitations in her ability to interact with others and adapt or manage herself.  Tr. 81.  Regarding Tollon's RFC, Dr. Zeune found that she could perform 1–2 step tasks.  Tr. 85-86.  On January 22, 2019, Carl Tishler, Ph.D., affirmed Dr. Zeune's opinion.  Tr. 128, 132-133.

*Second application*: On June 19, 2020, James Cacchillo, M.D., reviewed Tollon's record and assessed the same limitations as the reviewers in the prior application and added a limitation to avoid all exposure to unprotected heights and dangerous machinery.  Tr. 765-766.  On October 5, 2020, Robert Kilinger, M.D., affirmed Dr. Cacchillo's findings.  Tr. 776.

On June 22, 2020, Irma Johnston, Psy.D., reviewed Tollon's record and found that she had moderate limitations in her ability to understand, remember, or apply information, concentrate, persist, or maintain pace, interact with others, and adapt or manage herself.  Tr. 764.  Regarding Tollon's RFC, Dr. Johnson found that she could understand and remember simple to moderately complex tasks with 1–4 steps that could be carried out at an average pace; relate adequately to familiar others on an occasional and superficial basis in a position that did not require maintaining a friendly demeanor, negotiation, or persuasion; and tolerate ordinary stressors in a routine environment with infrequent changes.  Tr. 767-768.  On October 16, 2020, Aracelis Rivera, Psy.D., affirmed Dr. Johnston's findings.  Tr. 773, 777-778.

## D.    Hearing Testimony

During the April 28, 2021 telephonic hearing, Tollon testified to the following:

- She lives by herself; at the time of the prior hearing she had a roommate but it didn't work out.  Tr. 683-684.  She is not good around people and is better off alone.  Tr. 684.  She has lived alone for about a year.  Tr. 684.

- She has a driver's license but no longer drives because the vehicle she has, that belonged to her late husband, is a Jeep with a manual transmission and it's too hard for her to get in and out of and to shift.  Tr. 685.

11

- When asked why she has been unable to work since 2018, she stated that she can hardly walk, she had problems with her right, dominant hand, she is in pain all day and she wakes up 3-4 times during the night due to pain, her lumber x-rays showed significant changes, she's constantly falling, and she needs to use a cane. Tr. 694. She has no life, she barely bathes herself, she doesn't clean her house, and she can't take care of herself. Tr. 694.

- When asked to describe her pain, she stated that she has headaches constantly, joint pain throughout her body, nodules on her fingers from using her joints that make her hands look like they belong to a 70-year-old, and her mental status. Tr. 695. When asked what conditions most affect her, she said she usually has headaches every day and has lesions on her brain. Tr. 695. She takes medication but experiences side effects. Tr. 695. During the hearing she had her feet elevated and was on a heating pad; she had just taken her Tylenol, muscle relaxers, and Topamax. Tr. 696. Everything hurts; one day it's her knees, then it's her back. Tr. 696. She can't bend down and she can't tie her shoes. Tr. 696.

- She has tried so many different medications and she is very sensitive to them; she has side effects and her doctors have agreed that she is sensitive to medication. Tr. 696. Currently she takes headache medication, which doesn't make them go away but dulls them; sleep medication, but she still wakes up at least twice at night; a muscle relaxer; and vitamins. Tr. 696. She goes to her rheumatologist every 3 months for steroid injections, which help for about a week. Tr. 696.

- When asked about taking care of herself and household chores, she stated that her daughters-in-law come once a month to buy her groceries, do laundry, and clean. Tr. 697. Sometimes one of them, who lives nearby, will bring food over if they cooked something she likes. Tr. 698. She usually doesn't go anywhere and she wears pajamas or a robe. Tr. 698. She used to enjoy Epson salt baths but doesn't do that very often anymore because of her back; once she gets down she can't hardly get up. Tr. 699.

- On a typical day, she doesn't have a schedule and sleeps at different times depending on how she slept at night. Tr. 699. She makes a cup of coffee; she has to drink it out of a cup with a handle and lid because she drops and spills things. Tr. 699-700. She can't squeeze her toothpaste out and she has pumps on her shampoo. Tr. 700. She can only hold light-weight plastic eating utensils. Tr. 703. She sits in her chair and looks out the window. Tr. 700. She might watch an old rerun on television but she can't focus. Tr. 700. She used to crochet but can't anymore because her hand doesn't work. Tr. 700. It's been years since she has crocheted. Tr. 700. She used to read but doesn't anymore because she can't comprehend. Tr. 701. She Facetimes to see her grandchildren. Tr. 702.

- When asked about using a cane, she said it was a struggle because she hasn't found the balance yet. Tr. 704. She has fallen so she has to be careful. Tr. 704. She uses it when she walks outside when her brother takes her out and she walks very slow. Tr. 704. She rarely has to go down the stairs to the lower level of her condo. Tr. 699, 704. When asked how her foot problems affect her cane use, she said that she wears slip-on shoes and she has to be cautious because she's not perfect using the cane yet. Tr. 705. She sometimes feels like a walker would be better because she doesn't have right hand strength. Tr. 705.

- When asked if she has tremors, she stated that she constantly has restless leg syndrome and tremors in her hands.  Tr. 705.  When asked about elevating her legs, she said that she feels that when her legs are elevated it takes pressure off her lower spine.  Tr. 706.  When asked to describe her headaches, she said it felt like she has things crawling in her head, feels numbness in her face sometimes, and tingling and black spots on her eyes.  Tr. 706-707.  She feels pressure like someone is squeezing her brain and it doesn't let up.  Tr. 707.  Her headaches last all day and never go away.  Tr. 707.  She also has asthma and experiences shortness of breath.  Tr. 707.

- When asked about her depression, she said that she had been going to therapy, and taking medications, but they were a big problem because of her drug sensitivity.  Tr. 708.  The last time she went, she sat in her vehicle in the parking lot and cried.  Tr. 708.  She was unhappy about who she was seeing and she had gotten a new name from her other providers and was getting ready to start seeing someone when Covid happened.  Tr. 708.  She feels depressed and she can't get over the loss of her husband.  Tr. 708.  She has nightmares and sweating episodes and PTSD.  Tr. 708-709.  She is very anxious about everything.  Tr. 709.

The VE confirmed that Tollon's past relevant work was a composite job of workshop supervisor and home health aide.  Tr. 692-693.  The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Tollon could perform Tollon's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 711-712.  The VE answered that such an individual could not perform Tollon's past work but could perform the following representative jobs in the economy: office helper or clerical assistant, cafeteria assistant, and mailroom clerk.  Tr. 712.

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) she

13

had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive DWB.  20 C.F.R. § 404.335.  To receive DWB, a claimant must meet certain marital requirements.  *Id*.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.    It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

3.    The prescribed period ended on December 31, 2020.

4.    The claimant has not engaged in substantial gainful activity since February 2, 2018, the alleged onset date (20 CFR 404.1571 *et seq*.).

5.    The claimant has the following severe impairments: degenerative disc disease and other spine disorders; inflammatory arthritis; fibromyalgia; neurocognitive disorder; depressive disorder; anxiety disorder; and trauma and stressor-related disorder (20 CFR 404.1520(c)).

6.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

7.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: occasionally push/pull with the bilateral lower extremities; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; never be exposed to hazards, such as unprotected heights and dangerous machinery; limited to performing simple, routine tasks; limited to occasional interactions with supervisors, coworkers and the public; and limited to occasional workplace changes.

8.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

9.    The claimant was born on April **, 1967 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

10.   The claimant has at least a high school education (20 CFR 404.1564).

11.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

13. The claimant has not been under a disability, as defined in the Social Security Act, from February 2, 2018, through the date of this decision (20 CFR 404.1520(g)).

Tr. 651-665.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because

16

there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. Tollon's constitutional challenge fails

Tollon argues that the ALJ who decided her case was delegated authority from then-Commissioner of Social Security Andrew Saul, and, because the statute under which Saul was appointed had an unlawful removal clause, it follows that Saul had no authority to delegate authority to the ALJ. Doc. No. 9, pp. 10- 11; Doc. No. 13, p. 4.  That argument fails because it is at odds with *Collins v.*

17

*Yellen*, 141 S. Ct. 1761, 1788–89 (2021), which requires a showing of compensable harm stemming from the unconstitutional removal provision. *See also Colbert v. Comm'r of Soc. Sec. Admin.*, 2022 WL 556738, at *2 (N.D. Ohio Feb. 24, 2022); *Reese v. Kijakazi*, 2022 WL 831122, at *3 (N.D. Ohio Mar. 21, 2022). Tollon asserts that Saul made changes to HALLEX and new regulations which impacted her application for benefits (Doc. No. 9, p. 11; Doc. No. 13, p. 8), but does not identify what specific changes were made and how they harmed her. She contends that the President made statements when he terminated Saul from which it can be "inferred" that he was dissatisfied with Saul and it "appeared" that the President "believed that Mr. Saul had infringed on the constitutional due process rights of disability applicants such as Tollon." Doc. No. 9, p. 12. Such watery allegations are insufficient to show the type of compensable harm stemming from the unconstitutional removal provision that was described in *Collins*, and her argument fails. *See Colbert*, 2022 WL 556738, at *2 (N.D. Ohio Feb. 24, 2022).

In her reply brief, Tollon argues that the Social Security Commissioner could only be removed for neglect of duty or malfeasance of office, which is a higher standard for removal than the statutes at issue in *Seila Law LLC v. Consumer Financial Protection Bureau*, ⸺ U.S. ⸺, 140 S. Ct. 2183 (2020) and *Collins*. Doc. No. 12, p. 4 (citing 42 U.S.C. § 902(a)(3)). Thus, Tollon claims, "the issue in this matter was even more unconstitutional." Doc. No. 13, pp. 4-5. But she cites no legal authority indicating that the compensable harm requirement in *Collins* is meant to be applied on a sliding scale depending on the removal language in the relevant statute. Thus, the undersigned finds that Tollon's constitutional challenge fails.

### B. The ALJ complied with the remand order

Tollon argues that the ALJ failed to comply with the remand order instructing the ALJ to explain how she considered the factors of supportability and consistency when she evaluated Dr. Ignat's opinions. Doc. No. 9, pp.13-14; Tr. 786-787 (remand order). The ALJ considered Dr. Ignat's opinions

18

as follows:

> I am not persuaded by the opinions of Gheorgne Ignat, M.D. (10F; 24F). On May 21, 2019, Dr. Ignat opined that the claimant could stand/walk for 2 hours and sit for 6 hours out of an 8-hour workday, would need additional unscheduled breaks throughout the day for 20 minutes, was incapable of performing even "low stress" work and would be absent more than four days from work each month (10F). On January 20, 2021, Dr. Ignat opined that the claimant could sit/stand/walk less than 2 hours out of an 8-hour workday, would need even more unscheduled breaks throughout the day, could never lift more than 10 pounds, was incapable of performing even "low stress" work and would be absent more than four days from work each month (24F). There is nothing in the record to support such extreme limitations. While treatment notes do show positive tender points and some limited range of motion, there is no indication that the claimant lacks the ability to stand and walk (19F; 20F; 23F). Rather, she had normal range of motion in her ankles, hips, and knees (19F; 20F; 23F). Additionally, the claimant reported that generally, she felt "ok" after starting injections for fibromyalgia (23F/52).

Tr. 662.

Tollon asserts, "This brief analysis failed to address the supportability and consistency of the opinions of Dr. Ignat." Doc. No. 9, p. 15, 17.  The undersigned disagrees; the ALJ's statements make clear that she did not find Dr. Ignat's opinions to be persuasive because the severe restrictions were not supported by or consistent with the evidence.  Tollon does not dispute that she was found, on a regular basis, to have a normal range of motion in her lower extremity joints, a normal gait and station, and reported improvement from injections.  She does not dispute that the ALJ cited Dr. Ignat's records and Dr. Ramella's records covering 2018 through 2020, *i.e.*, those objective exam findings were consistent. Tr. 662 (citing Dr. Ignat's records (19F and 20F) and Dr. Ramella's records (23F)).

Tollon argues that the ALJ erred because she "failed to address the fact that Tollon testified that she was using a cane," which was "corroborated by Dr. Ignat's assessment in May 2021 that Tollon needed a cane for walking and standing due to imbalance, pain, and the fact that she fell 3 times recently." Doc. No. 9, p. 17.  First, the remand order that Tollon claims the ALJ violated did not include instructions regarding a cane.  Next, elsewhere in the decision, the ALJ explained that there was no evidence documenting a medical need for an ambulation assistive device.  Tr. 653.  Indeed, Tollon does

19

not identify record evidence indicating that she ever presented to a medical provider using a cane; that any provider, upon exam, found her to have problems standing or walking; that any provider prescribed a cane; or that any treatment note shows that she had reported falling.  Her testimony, alone, does not qualify as medical documentation establishing the need for a cane.  *See Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 3738270, at *12 (N.D. Ohio July 29, 2014) ("Mitchell's testimony does not qualify as 'medical documentation establishing the need' for the cane under SSR 96–9p.").  In short, she has not shown that the ALJ erred with respect to her alleged use of a cane.

In sum, the undersigned finds that Tollon has not shown that the ALJ's evaluation of Dr. Ignat's opinions was contrary to the remand order or not supported by substantial evidence.

## C. The ALJ did not err at step two[3]

Tollon argues that the ALJ erred at step four when her RFC assessment did not include all Tollon's severe impairments.  Doc. No. 9, p. 18.  She then purports to challenge the ALJ's finding at step two that her foot surgeries and hand tremors were not deemed severe and argues that the ALJ erred because her RFC assessment did not include limitations due to her hands.  Doc. No. 9, pp. 19-20; Doc. No. 13, p. 2.

To the extent Tollon argues that the ALJ erred at step two, any error is harmless because the ALJ continued through the remaining steps and could consider her foot surgeries and hand tremors when assessing the RFC.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing

---

[3]  In her brief, Tollon's counsel has presented a variety of arguments unrelated to the issue in the heading she purports to challenge.  Tollon's counsel is an experienced Social Security practitioner who regularly practices in this Court and has been warned before about her continued practice of lumping various challenges to different steps of the sequential disability evaluation together.  *See, e.g.*, Case No. 1:21-cv-00556, Doc. No. 19, p. 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, p. 34, n. 5 (filed 2/2/2022); Case No. 5:21-cv-01721, n. 5 (filed 4/14/2022); see also Case No. 5:20-cv-01340, Doc. No. 21, p. 26, n. 9 (filed 8/16//2021); Case No. 1:20-cv-01186, Doc. No. 21, p. 25, n. 8 (filed 8/16/2021).  Counsel's failure to present arguments in a way that the Court can address them, and Defendant can respond to them, may result, in the future, in the Court deeming an argument to be improper and/or declining to grant a requested page extension.

an RFC); *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 Fed. App'x 394, 395 (6th Cir. 2018). At step four, the ALJ recognized that Tollon had a bunionectomy in February 2018 and that she had listed "feet problems" in her February 2018 disability application. Tr. 658, 657, 661. The ALJ also remarked that Tollon was found to have a normal range of motion in her feet after her surgery, Tr. 659, and provided postural limitations in her RFC assessment based, in part, on her bunions, Tr. 661. Tollon does not identify evidence that her bunion surgery in 2018 caused her any issues; indeed, the only treatment note she cites in which she complained of foot pain is a record from January 2018, prior to her alleged onset date and her bunion surgery. Doc. No. 9, p. 19 (citing Tr. 460-462). Thus, the undersigned finds that the ALJ considered her feet issues when assessing her RFC and any alleged error at step two was harmless. *Maziarz*, 837 F.2d at 244.

With respect to her tremors, while true that the ALJ did not discuss tremors, it is also true that Tollon has identified only one treatment note in the record in which Tollon was observed to have tremors, a visit with Dr. Ramella in June 2019. Doc. No. 9, pp. 19-20 (citing Tr. 633). She does not cite any treatment she pursued, any further evidence indicating that she had tremors, or any functional limitations that were caused by tremors. The undersigned finds that the ALJ did not err when she did not discuss a symptom that Tollon reported, once, to her primary care provider. *See Thacker v. Comm'r of Soc. Sec.*, 99 Fed.App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for [the] decision to stand.").[4]

**D. The ALJ considered Tollon's pain and Tollon has not identified an error**

Tollon spends three pages reciting medical evidence and then argues that the ALJ failed to consider her pain symptoms. Doc. No. 9, pp. 20-23. That is incorrect; the ALJ considered Tollon's allegations regarding her pain (Tr. 657) and the record evidence showing that she reported and/or was

---

[4] Tollon also includes references to hand pain in her tremor argument. Doc. No. 9, pp. 19-20. The undersigned addresses her hand pain when discussing Tollon's argument regarding the ALJ's evaluation of her pain symptoms, *infra*.

21

found to have pain in her back, neck, various joints (including her hands), throughout her body, and headaches (Tr. 657-659).  The ALJ explained that Tollon's pain was improved by medication and injections and that her standard practice was 3-month follow-up visits.  Tr. 658-659.  The imaging results of her spine showed mild to moderate findings and no further imaging was taken or included in the record (Tr. 657) and she regularly had normal range of motion in most of her joints (Tr. 659). Tollon does not dispute that evidence.

Tollon then states, without further explanation, "Failing to complete a thorough analysis of the impairments was in error and should result in a remand of this matter."  Doc. No. 9, p. 23.  That argument is not developed and the undersigned finds that Tollon has waived it.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

### E. The ALJ did not err at step three

At step three, the claimant bears the burden of establishing that her condition meets or equals a listing.  *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Id*. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing."  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

22

Tollon argues that the ALJ erred when she failed to consider whether the medical evidence regarding her headaches satisfied the criteria of Listing 11.02, as required by Social Security Ruling 19-4p.  Doc. No. 9, p. 23.  But SSR 19-4p provides that an ALJ must first determine whether the claimant has a medically determinable impairment ("MDI") of "primary headache disorder," which is not found "based only on a diagnosis or a statement of symptoms."  2019 WL 4169635, at *5-6 (Aug. 26, 2019).  Here, Tollon only cites to her statements of headaches symptoms.  Doc. No. 9, p. 23.  Moreover, SSR 19-4p states, "We will not establish secondary headaches (for example, headache attributed to trauma or injury to the head…) as MDIs because secondary headaches are symptoms of another underlying medical condition."  *Id*. at *5.  Thus, the undersigned finds that Tollon has not identified evidence showing that her headache is a "primary headache disorder" such that the ALJ was required to consider Listing 11.02.

Next, Tollon argues that the ALJ "failed to properly consider the effects of Tollon's fibromyalgia as required by SSR 12-2p."  Doc. No. 9, p. 24.  She asserts, "the ALJ failed to assess Tollon's fibromyalgia fatigue and other symptoms as noted by her treating sources."  Doc. No. 9, p. 24.  But the ALJ discussed SSR 12-2p (Tr. 654); considered various listings, including Listing 14.09 (Inflammatory arthritis); acknowledged that Tollon had been diagnosed with fibromyalgia in April 2019 and experienced pain, irritability, and grogginess (Tr. 658); considered her reports of fatigue, which, in part, supported the ALJ's RFC limitation to avoid hazards (Tr. 659); and recognized that her treating provider, Dr. Ignat, had given her medications and trigger point injections to control her pain, which helped (Tr. 658-659).  Tollon does not challenge those findings; rather, she submits, without more, that the ALJ should have found her disabled or, at least, limited to sedentary work.  Doc. No. 9, pp. 24-25.  But the ALJ disagreed, and Tollon has not shown that her findings were in error.

Tollon also challenges the ALJ's finding that her spinal impairments did not satisfy Listings

23

1.15 and 1.16 because the record did not show an inability to ambulate, as both listings require.  Doc. No. 9, p. 25; Tr. 652-653.  But, as explained above, Tollon has not established that she required a cane to ambulate.  Thus, the undersigned finds that her step three argument regarding her spinal impairments fails.

Finally, Tollon argues that the ALJ erred when she evaluated her psychological impairments under Listings 12.02, 12.04, 12.06, 12.11, 12.15.  Doc. No. 9, p. 25.  All those listings require that the claimant satisfy the paragraph "B" criteria, *i.e.*, the mental impairments must result in one extreme limitation or two marked limitations in four area of functioning: understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself.  20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.02, 12.04, 12.06, 12.11, 12.15.  The ALJ found that Tollon had "moderate" limitations in those four functional areas.  Tr. 665.

Tollon argues that the ALJ's recitation of her limitations is inconsistent with a finding that those limitations were "moderate."  Doc. No. 9, p. 26.  But the ALJ disagreed, and Tollon does not explain what, precisely, she believes was error.  Moreover, the ALJ found the state agency reviewers' opinions—that Tollon had moderate limitations in the four areas of functioning—to be persuasive (Tr. 661-662), which is also evidence that supports the ALJ's paragraph B findings.

In her reply brief, Tollon argues that the neuropsychological evaluation supports marked limitations (Doc. No. 13, p. 1), but the ALJ stated, with accuracy, that that examiner found Tollon to have a mild cognitive impairment, which was likely related to her prior head injury and which MRI results showed had remained unchanged for a decade, and that intelligence testing placed her in the low average range.  Tr. 660.  She had some memory deficits but, overall, her memory function was intact and the examiner stated that her "subjective complaints of memory impairment" were due to her emotional state, for which she recommended therapy.  Tr. 406, 659-660.  The undersigned finds that the

neuropsychological evaluation findings do not support "marked" limitations, as Tollon alleges.

In sum, the undersigned finds that Tollon has not shown that the ALJ erred at step three.

## F. Tollon's additional arguments are waived

Tollon makes general assertions, untethered to any specific fact or argument, that the ALJ erred when finding that she was capable of engaging in work at the light level of exertion on a full-time and sustained basis. She states, "Even if Tollon could complete some activities, the Southern District of Ohio has held that the ability to perform some activities on a limited basis is not substantial evidence that a claimant's symptoms were not disabling." Doc. No. 9, p. 27 (citing *Lorman v. Comm'r of Soc. Sec.*, 107 F.Supp.3d 829, 838 (S.D. Ohio 2015)). But she doesn't identify what "activities" the ALJ relied upon in error; thus, that argument is waived. *McPherson*, 125 F.3d at 995–996. Next, she writes,

> Tollon is alleging disability due to the fact that her functional limitations were sufficient to establish disability. *See Tenney v. Comm'r of Soc. Sec.*, No.4:20cv1569, 2021 WL 4393538, at *7 (N.D. Ohio, Sept. 7, 2021) citing to *Miller v. Comm'r of Soc. Sec.*, No. 1:13cv763, 2015 WL 350570, at *12 (S.D. Ohio Jan. 26, 2015) where the case was remanded as the ALJ failed to consider the functional limitations. In this matter, the ALJ analyzed the evidence so as to support her desired conclusion that Tollon was capable of engaging in substantial gainful activity at the light level of exertion on a full-time and sustained basis. Even though Tollon had the burden of proof at Step Three of the Sequential Evaluation, the ALJ had the obligation to conduct a full and fair inquiry into each claim and develop the record fully and fairly as to all components of the applicable Listings, including an evaluation of the evidence and an explained conclusion. *See Johnson v. Secretary of Health and Human Services*, 794 F.2d 1106, 1111 (6th Cir. 1986) and *Reynolds v. Comm'r of Soc. Sec*, 424 Fed. Appx. 411, 416 (6th Cir. 2011). In addition, the ALJ must articulate a basis for the Step Three finding beyond a perfunctory statement. *See Illitch v. Comm'r of Soc. Sec*, No. 1:17-cv-835, 2019 WL 1324050, at *9 (S.D. Ohio Mar. 25, 2019) quoting *Minnick v. Colvin*, 775 F.3d 929 (7th Cir. 2015). As set forth above, the evidence in this matter established that the ALJ failed to properly consider the relevant evidence and failed to provide sufficient information so this Court can facilitate meaningful judicial review. This was harmful and reversible error.

Doc. No. 9, p. 28. Tollon's argument fails: first, because she does not explain how the legal issues she cites relate to this case; and second, because she conflates step three language with RFC language. Her additional, boilerplate arguments—"the ALJ failed to correctly address the combination of Tollon's severe impairments" and "the ALJ erred when she did not build an accurate and logical bridge between

the evidence documenting Tollon's disabling problems as set forth in the record, and the ALJ's decision to deny benefits"—are undeveloped.  Doc. No. 9, p. 29.  Accordingly, the undersigned finds that Tollon has waived the arguments listed above.

### G. The ALJ did not violate SSR 16-3p

Finally, Tollon argues that the ALJ violated SSR 16-3p when she evaluated Tollon's symptoms. Doc. No. 9, p. 30.  SSR 16-3p provides that an ALJ evaluates a claimant's subjective reports of symptoms by considering the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence.  2017 WL 5180304, at *5-8 (Oct. 25, 2017). Here, the ALJ considered Tollon's complaints (in her hearing testimony, function report, disability application, and during visits with her providers), the objective medical evidence (exam findings, cognitive testing, imaging results, diagnoses), treatment she received (medication, therapy, injections), daily activities, medical opinions, and the function report completed by Tollon's daughter-in-law.  The ALJ concluded that, based on her rheumatology records, physical exams findings, and neuropsychological evaluations, her condition improved with treatment, suggesting that she was not as limited as she alleged.  Tr. 662.  Thus, Tollon's assertion that the ALJ "failed to discuss the evidence which supported Tollon's testimony and the deterioration of her condition and failed to articulate any rationale beyond the boilerplate paragraph" fails.  Doc. No. 9, p. 32.  She does not cite the portion of SSR 16-3p that she believes the ALJ violated.  She does not challenge the ALJ's conclusion.  The undersigned finds that Tollon has not shown that the ALJ violated SSR 16-3p.

For all the reasons stated above, the undersigned finds that Tollon has not shown that the ALJ erred.  Accordingly, the undersigned recommends that the Commissioner's decision be affirmed.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: May 3, 2022                                    *s/ Jonathan Greenberg*
                                                     Jonathan D. Greenberg
                                                     United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).**